## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BANCO LAVRA,

                Plaintiff,

v.

COMERICA BANK,

                Defendant.

_____/

CASE NO. 03-60200

HON. MARIANNE O. BATTANI

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      Before the Court are Plaintiff Banco Lavra's Motion for Summary Judgment (Doc.
# 155) and Defendant Comerica Bank's Motion for Summary Judgment (Doc. # 156).  On
July 12, 2005, the Court heard oral argument.  At the conclusion of the hearing, the Court
took the motions under advisement as well as Plaintiff's Motion for Reconsideration of
Motion for Leave to File Supplemental Response to Defendant's Motion for Summary
Judgment (Doc. # 186).  For the reasons that follow, the Court GRANTS in part and
DENIES in part Defendant Comerica Bank's Motion for Summary Judgment and DENIES
Plaintiff Banco Lavra's Motion for Summary Judgment.  The Court further DENIES
Plaintiff's request for reconsideration, because Plaintiff fails to demonstrate a palpable
defect by which the Court has been mislead.

**I.     STATEMENT OF FACTS**

Banco Lavra (Lavra), a Brazilian bank and financial services institution which is no longer in business, filed this action after Defendant Comerica Bank (Comerica) failed to purchase it.   In its Amended Complaint, Plaintiff alleges claims for breach of contract (Count A), breach of fiduciary duty and fraud (Count B), quantum meruit (Count C), and wrongful interference with contractual relations, commercial disparagement and defamation (Count D).

Comerica countersued for breach of contract and fraud.   The Court previously awarded summary judgment to Comerica on its breach of contract counterclaim so only the fraud counterclaim remains.   A brief recitation of the facts giving rise to these claims follows.

In 1998, Comerica's International Finance Division, directed by Douglas Ransdell, and Ralph Heid, head of the Latin America Group, decided to explore opportunities in Brazil.   They asked Z. Susan Guarda Garrity ("Guarda"), a vice president responsible for Comerica's lending customers having loans or operations in Brazil, to mine her contacts. At that time, Comerica did not have its own office in Brazil, and its transactions were limited to exchanges processed through a variety of correspondent banking relations.

Guarda knew David Figueiredo, the head of the International Department at Lavra, and she told him that Comerica was entertaining the idea of launching a Brazilian platform. Def.'s Ex. 11, Guarda Dep. at 111-12.   Figueiredo took this information to Amedeu Papa, Sr., who was president of Banco Lavra.   The bank was part of a conglomerate of companies controlled by the Papa family.   See Def.'s Ex. 3.   In 1998, four brothers, Amedeu, Sr., Valdner, Marcio and Jose, Jr. owned 11.63% of the stock of the principal

2

holding company.  Their parents owned 53%.  Amedeu Papa, Sr. managed the bank until his death in June 1999.  His son Amedeo Papa, Jr. took over management at that time. Def.'s Ex. 5, Sergio Tamouki Dep. at 297.

In March 1998, Guarda and some of the shareholders of Lavra, including Amedeu Papa, Sr., Marcio Papa and Valdner Papa, engaged in preliminary discussions about Comerica's possible acquisition of Lavra.  Amedeu Papa, Sr. indicated he would be interested in selling a "minor part of Lavra," but that more discussions would have to take place.  Def.'s Ex. 11, Guarda Dep. at 115-16.

On April 17, 1998, Ransdell, Heid, and Guarda from Comerica, and Amedeu Papa, Sr., Valdner Papa, and Amedeo Papa, Jr. met in Miami.  Comerica made a presentation concerning the costs and benefits of a proposed acquisition.  Am. Compl. at ¶ 15.

During the same time period, Comerica representatives had also instituted communications with members of the Brazilian Central Bank ("BACEN") in Brasilia.  Am. Compl. at ¶ 17.  The discussions included efforts by Comerica to negotiate the "toll" payable for obtaining a license to start a new bank.  Because the toll for a new bank at that time was $10,000,000 for the license alone, Lavra was an attractive acquisition target.

After the April meeting, further discussions of the terms of an acquisition took place. In May, the same people met in Sao Paulo, Brazil to "brainstorm."  Def.'s Ex. 7, Amedeo Papa, Jr. Dep. at 249.  Amedeo Papa, Jr. characterized discussions as "very, very preliminary."  Id.  Valdner Papa suggested an arrangement with four phases.  Def.'s Ex. 9, meeting agenda.  The phases went from provision of a credit line to minority ownership, to majority ownership, to consideration of the sale of the entire bank.  See id.  The proposal afforded flexibility to Comerica:  it could do as much or as little as it wanted.  Def.'s Ex. 8,

3

Marcio Papa Dep. at 505-06.

According to Valdner Papa, at the meeting an oral agreement was reached for an acquisition price that was 65% of Lavra's value, which at that time, was $34.5 million. Def.'s Ex. 6, Valdner Papa Dep. at 407-09 (testifying that a price condition was established). Valdner Papa reached this conclusion when the proposal was made because Comerica's representative remained silent. Id. Lavra's shareholders agreed to stay at the bank for 3 to 5 years after completion of the acquisition.  Am. Compl. at ¶ 15.  According to Comerica, after the meeting Ransdell said he would "start talking about" presenting Lavra as a possible acquisition candidate.  Def.'s Brief in Support of Motion for Summary Judgment at 5.

On July 6, 1998, representatives of the parties met again.  Joe Buttigieg, Executive Vice President of Comerica, was in Brazil and attended the meeting.  The parties dispute what happened after the meeting.  According to Lavra, Guarda assured Lavra's shareholders that the acquisition was a "done deal" and "shook hands" on it.  Am. Compl. at ¶ 18.  Then Guarda requested, and Lavra provided, internal and confidential information. Id. at ¶ 19.  In contrast, Comerica claims that Guarda only represented that the proposed acquisition had been accepted by the International team and that it would be presented to the executive committee.  In her June 21, 1998 letter to Amedeo Papa, Guarda discusses the demanding and lengthy process in dealing with Comerica.  Def.'s Ex. 16.  She subsequently faxed a request to Valdner Papa, dated July 14, 1998, requesting "information [that] was needed to in order to present to [its] executive committee [its] recommendation of establishing a relationship with Banco Lavra."  Def.'s Ex. 18, Guarda fax.

4

Thereafter, Ransdell presented a proposal to senior management for "approval to undertake due diligence regarding the purchase of a controlling interest in a small Brazilian commercial bank."  Def.'s Ex. 21.  At the September 16, 1998 meeting, the Chairman of Comerica, Eugene Miller, wrote "purchase of a bank is dead for the time being;"  Am. Compl. at ¶ 21.   Nevertheless, the committee did approve the establishment of a "representative office" in Brazil.  Am. Compl. at ¶ 20.

Ransdell asserts that he informed the Papas of this decision.  There is a dispute as to what information was conveyed.  Guarda did inform Lavra that due to a "financial crisis in Asia, any acquisition would be delayed.  Later, she told Lavra it would be delayed again due to the Russian "financial crisis.  Am. Compl. at ¶ 20.  Without question, the precise content of Miller's note was not revealed to the Papas, but they certainly were informed that a decision to purchase was not made.

Guarda subsequently suggested that the parties should exchange final documents so the acquisition could be finalized when the international financial markets settled down. AC at ¶ 22.  Ransdell and Guarda told Amadeo Papa, Marcio Papa, and Valdner Papa, that Comerica would sign a Strategic Alliance to show their good will and good faith.

Comerica and Lavra entered into a Strategic Alliance Agreement ("SA") on October 13, 1998.  The SA provides that its purpose is "to create optimum conditions for good customer service. . .to improve existing customer relations and participate in new opportunities of mutual benefit to both participants."  Def.'s Ex. 23.  Another relevant provision includes that the parties agree "at their [sic] sole discretion, to use each other's products and services when reasonably possible and consistent with their other business relationships in the conduct of business involving [clear] payments, commercial trade letters

5

of credit, collections, closing of. . .exchange, foreign exchange and such other business opportunities that are of interest to both participants."  Id.  They agreed to "share 50/50 on revenues and fees earned on the Brazilian side of transactions on corporate relationships introduced by Comerica to Banco Lavra. . . ."  Id.  In addition, each party retained the right to decline to participate in a proposed transaction and could terminate the agreement with three months notice.  Id.

After the SA was signed, Guarda presented a three-page document titled "Transactions to be Closed under Strategic Alliance between Banco Lavra and Comerica Bank" (Transactions Attachment).  Def.'s Ex. 24.  The Transactions Attachment lists existing Comerica customers, types of services provided, and the amount of Comerica's then-existing loan facility with each customer.  See id.  All signatories to the SA initialed the Transaction Attachment.  Id.

The relationship between the parties continued.  In November 1998, Buttigieg, Heid and Guarda traveled to Brazil and made joint customer calls.  Throughout the time period immediately following the signing of the SA, Guarda made numerous customer calls with Lavra officers.

In February 1999, Comerica leased space from Lavra, and Guarda used the space as headquarters for Comerica's representative office,  Comerica do Brasil.  Am. Compl. at ¶ 28.  Throughout this timeframe, Comerica kept in regular contact with BACEN, discussing the toll charge if Comerica were to purchase a bank and trying to convince BACEN to waive it.  Id.  Yet, Guarda attended some BACEN meetings with representatives from Lavra.  According to Amedeo Papa, Jr., Guarda represented to BACEN that Comerica had a firm intention to pursue an acquisition, but due to the volatility of the financial market, the board

6

had not yet approved the purchase.

In May, 1999, Miller was in Brazil for the grand opening of the representative office. He indicated that Comerica was interested in acquisition, but any purchase was subject to Board approval. Def.'s Ex. 7, A. Papa, Jr. Dep. at 243-44.

On April 28, 1999, BACEN ordered Lavra and its accounting firm to appear before BACEN's Inspection Department. Def.'s Ex 1. Adjustments to Lavra's balance sheet were demanded in February 1999, and Lavra was left with a negative net equity. Id. BACEN mandated an injection of capital or a plan to bring the bank within regulations for liquidity and reserves. Id. BACEN subsequently warned Lavra that failure to comply could result in legal penalties. Id. Lavra did not provide a copy of this document to Comerica, and the parties dispute the extent to which information regarding Lavra's financial health was disclosed to Comerica. Def.'s Ex. 7, A. Papa, Jr. Dep. at 710, 802 (admitting that he never mentioned the negative net worth).

Also, during this timeframe, Ransdell and Heid again prepared for a purchase presentation to senior management. Buttigieg asked Guarda to prepare a list of keepers—employees who Comerica should retain post-acquisition. Heid drafted a new formal presentation for senior management in July 1999, in which he recommended initiating due diligence with a "view to purchasing Lavra." Def.'s Ex. 32. At an August 9, 1999 meeting, Comerica's president, Eugene Miller, Buttigieg, and Ransdell outlined concerns that had been raised over the potential deal. Def.'s Ex. 33. At that time, Comerica also learned that the law regarding foreign ownership of banks in Brazil had changed, and it might be possible to obtain a license for a new bank without buying an existing bank. Def.'s Ex. 11, Guarda Dep. at 371-72. Senior management decided that

7

both options--purchase of an existing bank or opening a new bank--should be explored. Ransdell and Guarda met with BACEN on August 13, and 16, 1999, to pursue the opening a new bank option.  Mark Yonkman, an attorney for Comerica, also went to Brazil and met with BACEN governor Sergio D'Arcy on August 18, 1999, to explore the purchase of an existing bank.  At the meeting, D'Arcy confirmed that purchase of Lavra stock and assets would expose Comerica to successor liability.  Def.'s Ex. 15, Heid Dep. at 37-8.

On August 27, 1999, BACEN gave Lavra 15 days to present a definite proposal for sale of the bank to Comerica or another institution.  On August 30, Marcio Papa sent a letter to Comerica requesting a "definite and formal statement" from Comerica regarding its interest.  Def.'s Ex. 34.  At a conference call held September 2, 1999, Comerica indicated that it would not purchase Lavra.  Lavra entered voluntary liquidation on September 20, 1999.  Def.'s Ex. 35.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  In other words, the movant must show he would prevail on the issue even if all factual disputes are conceded to the non-movant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In assessing cross-motions for summary judgment, each movant must individually

8

fulfill the requirements articulated in Rule 56. The court is not required to grant summary judgment as a matter of law for either side; rather, the court evaluates each motion on its merits.

## III. ANALYSIS

Comerica seeks summary judgment on Banco Lavra's breach of contract claim, asserting it fulfilled its duties under the Strategic Alliance agreement and Lavra failed to fully perform. It seeks summary judgment on Lavra's breach of fiduciary duty claim, asserting that the parties did not have a fiduciary relationship, and even if they did, Comerica committed no breach. It seeks summary judgment on Lavra's claim of fraud, asserting that Comerica made no false representation, and even if it did, Lavra did not rely on it or relied unreasonably. Comerica also asserts that Lavra's other claims lack factual foundation.[1]

Lavra seeks summary judgment on the issue of liability, not damages, for its breach of contract claim, its breach of fiduciary duty claim, its fraud claim and Comerica's counterclaim of fraud. Although Lavra also seeks summary judgment on claims of negligent misrepresentation and promissory estoppel, these claims were not pleaded in the

---

[1]In its Motion for Summary Judgment, Lavra indicates that it "intends to delete its claim for wrongful interference with contractual relations, commercial disparagement and defamation." Pl.'s Motion for Summary Judgment at 2. Accordingly, the Court dismisses Count D of the Amended Complaint. No such concession is made as to Count C. Although Comerica advances an argument in its motion that Count C lacks factual support, see Brief in Support of Motion for Summary Judgment at 37, the Court finds that Comerica's single paragraph addressing the claim does not comport with its duty under the summary judgment standard. Moreover, Comerica's reliance on Lavra's failure to respond to the argument is misplaced; it is not the Court's obligation to read referenced exhibits and discern how they support Comerica's position.

Amended Complaint. Lavra sought leave to file a second amended complaint, which added claims of negligent misrepresentation and promissory estoppel, and deleted its claims of quantum meruit, and wrongful interference with contractual relations, commercial disparagement and defamation. Lavra subsequently withdrew its request. See Doc. # 137. Although Lavra argues for summary judgment on the unpleaded claims raised in its proposed second amended complaint in its motion, the Court restricts its consideration to those claims raised in the Amended Complaint. See Stemler v. City of Florence, 126 F.3d 856, 872 (6th Cir. 1997) (affirming the lower court's refusal to consider a claim that the plaintiff raised for the first time on summary judgment).

## A. BREACH OF THE STRATEGIC ALLIANCE

The parties dispute whether Lavra can bring a breach of contract claim;  whether the Strategic Alliance imposed enforceable duties; whether the Transactions Attachment is part of the parties' agreement; and, whether Comerica complied with the terms of the Strategic Alliance and injury.[2]  Each issue is addressed below.

### 1. Is Lavra precluded from bringing a breach of contract claim?

Comerica's contention, that the doctrine of substantial performance precludes Lavra from enforcing the contract, builds upon the provision in the SA requiring the parties to share specified revenues and fees equally.  Comerica asserts that Lavra never paid Comerica any share of those fees.  Thus, Lavra failed to substantially perform its

---

[2]In a closing report prepared on Lavra, "the argument that the negotiations with Comerica. . .caused the financial imbalance of Banco Lavra" was rejected.  See Def.'s Ex. 36. The report concluded that the main cause [of Lara's failure] was the large number of loans without sufficient guarantees.  Id. at 4.1.  Comerica cites this as evidence that Lavra was not injured by any breach of contract.

10

obligations under the contract, and it cannot bring a breach of contract cause of action.

In response to the argument, Lavra maintains that revenue sharing was not the exclusive purpose of the agreement; therefore, any failure on its part to remit those revenues does not preclude its claim. According to Lavra, it has substantially performed its obligations under the SA, because it brought Comerica potential business opportunities in the automotive industry and brought its expertise in the Brazilian banking industry. Pl.'s Ex. C at 167-68, Exh, EE, Amedeo Papa, Jr. Dep. at 746, 747.

Under the substantial performance doctrine, when "a contract is made for an agreed exchange of two performances, one of which is to be rendered first, substantial performance rather than exact, strict or literal performance by the first party of the terms of the contract is adequate to entitle the party to recover on it." Brown-Marx Assoc., Ltd. v. Emigrant Sav. Bank, 703 F.2d 1361 (11th Cir. 1983) (citing 3A Corbin on Contracts, Sections 700-701; 6 Williston on Contracts (Third Edition), Section 842). The doctrine is used "to prevent unjust enrichment or the inequity of one party's getting the benefit of performance, albeit not strictly in accord with the contract's terms, with no obligation in return." Id. Consequently, the courts allow recovery under the contract where a party in good faith has substantially performed its obligations, but deduct a sum for deviations.

Typically, the doctrine is applied to building or insurance contracts, and the cases upon which Comerica relies to advance its position arise in that context. See e.g. P & M Constr. Co. v. Hammond Ventures, Inc., 3 Mich.App. 306, 314, 42 N.W.2d 468, 472 (1966) (observing that a prerequisite to an actionable breach of contract is substantial performance by the plaintiff and that a plaintiff substantially performs when he does everything necessary to fully accomplish the purposes for which the contract was entered);

11

Gibson v. Group Ins. Co., 142 Mich.App. 271, 275-76, 369 N.W.2d 484, 485 (1985) ("where deviations or alterations by a plaintiff essentially change the terms of performance, a failure of performance occurs") (quotation omitted).  Although the Court endorses Comerica's characterization of the contract--that the purpose was to create "new opportunities of mutual benefit to both participants," and part and parcel of the mutual benefit was the sharing of fees--the Court rejects the application of the doctrine as a means to preclude the resolution of this dispute.

At the outset, the Court observes that cases in which the doctrine has been applied are easily distinguished on several grounds.  First, the doctrine is typically invoked by a plaintiff seeking judgment for a contract price, by arguing he substantially performed the terms of the contract.  Underlying this argument is the plaintiff's admission that he did not strictly comply with the terms of the contract.  Accordingly, where a plaintiff has "performed valuable services for the defendant" under the contract and the "defendant has reaped the advantage, the plaintiff is entitled to recover" in accordance with the contract, "less any damages the defendant may have suffered by reason of failure in compete performance." Antonoff v. Basso, 347 Mich. 18, 28, 78 N.W.2d 604 (1956).  The object of the doctrine is to prevent forfeiture of work, labor and materials supplied by the substantially performing party." Star of Detroit Line, Inc. v. Comerica Bank, 1999 WL 33454888, *3 (Mich.App. 1999).  In addition, the doctrine serves as an equitable defense to contract recision.  The purpose would not be served here inasmuch as Defendant performed first and was free to pursue a breach of contract claim against Lavra.  Moreover, Defendant seeks to use the doctrine as a shield to prevent Plaintiff from proceeding on its claim that Defendant failed to perform other obligations under the contract.  Second, the cases in which the doctrine

12

is invoked typically involve construction or insurance contracts or lease agreements, whereas this case involves banking relations.   This distinction cannot be ignored. Defendant has not cited any authority to this Court indicating that Michigan's courts would expand the substantial performance rule to a wider variety of contractual disputes.   Thus, Defendant has failed to meet it burden to show its application to the situation here is justified.   Accordingly, the Court rejects Comerica's argument that the doctrine of substantial performance precludes Plaintiff's breach of contract claim, and the Court turns to the merits of the dispute.

### 2.  Is contract illusory?

To succeed on a breach of contract claim, the plaintiff must show a contract between the parties, the terms of the contract require performance of a certain action, a breach and that the breach caused injury to the other party.   See e.g. Symthes Spine Co. v. Calvert, 270 F.Supp.2d 939, 942 (E.D. Mich 2003) (articulating the elements for a breach of contract under Michigan law).  Comerica asserts that the parties' contract does not require performance of any action other than that the parties share revenues and fees equally. There is no assertion that Comerica did not.  The parties further limited their obligation to perform, stating that participation in given transactions would be at the "sole discretion" of each, that either party could decline to participate in a given transaction, see Def.'s Ex. 8, M. Papa Dep. at 599-600, and that the agreement could be terminated with three-months notice.  See Def.'s Ex. 23.  According to Comerica when a contract  leaves the quantity of business to be done to a party's sole discretion, the contract is illusory and unenforceable.

Comerica's position is not persuasive inasmuch as it relies on authority from other

13

jurisdictions to advance this argument, see e.g. Tow v. Miners Memorial Hosp. Ass'n, 305 F.2d 73, 76 (4th Cir. 1962) (holding that were a person contracts to do work to the satisfaction of another, the right to reject is absolute), and that authority conflicts with Michigan law.  Specifically, under Michigan law, a contract that is conditioned upon contingencies, the occurrence of which rests upon the discretion and control of one of the parties, imposes a requirement of good faith efforts on the part of the party in control. Mehling v. Evening News Ass'n., 374 Mich. 349, 352, 132 N.W.2d 25, 26 (1965),  Ferrell v. Vic Tanny Int'l, Inc., 137 Mich.App. 238, 243, 357 N.W.2d 669, 672 (1984).  If the party in control does not live up to the good faith requirement, its obligations under the contract become unconditional.  Mehling, 374 Mich. at 352, 132 N.W.2d at 26.  Thus, under Michigan law, the SA is not an illusory contract.  Lavra is free to prove its claim that Comerica breached the parties' duties under the Strategic Alliance agreement by failing to use its best efforts to call on customers to perform transactions under the agreement and/or by failing to extend sufficient credit to Lavra.

According to Lavra, Comerica did not send the business listed in the Transactions Attachment to Lavra, nor did Comerica facilitate Lavra's ability to handle the business by increasing the credit facility.  Lavra contends that as of February 1999, it was impossible for Lavra to effect transactions unless and until Comerica injected capital into its coffers. It concludes that Comerica's omissions amount to a breach of contract.

Before considering whether Comerica performed its duties under the Strategic Alliance in good faith, the Court must addresses the parties dispute as to whether the Transactions Attachment is part of their agreement.  There is no dispute Guarda drafted the SA in conjunction with Ransdell and Heid, Pl.'s Ex. C at 156, or that Guarda drafted the

14

Transactions Attachment.   Pl.'s Ex. S.   During the meeting, after the parties signed the Strategic Alliance, Guarda presented the Transactions Attachment she had prepared to Valdner Papa and Amadeo Papa, Jr.   The document is initialed by the Papas, Susan Guarda, Ralph Heid, and Doug Ransdell.   Although Comerica contests whether the Transactions Attachment is part of the Strategic Alliance, for purposes of this analysis, the Court will assume that it is and will use the Transactions Attachment as a yardstick for measuring whether Comerica acted in good faith.

### a. Good faith relative to transactions

Neither the SA nor the Transactions Attachment sets forth the number or types of transactions required to be completed or a timeframe for completion.   The absence of quantitative duties renders Lavra's task to show a breach more difficult.   Notably, the SA conditions the duties arising thereunder with the phrase, "consistent with the relative size of the parties."  Although the Transactions Attachment lists Comerica's existing customers, the types of services provided, and the amount of the then existing loan facility with each, it too contains few quantitative duties.   Def.'s Ex. 24.   It states that "transactions to be closed" under the Strategic Alliance would be done "in stages."  Id.   Further, the transactions were to be implemented only "with customer consent" and, according to Marcio Papa, the business pursued was subject to the language in the SA affording each party sole discretion to participate.   See Def.'s Ex. 8, M. Papa Dep. at 100-01.   Thus, Comerica was the sole judge of which transactions it would offer to perform, and Lavra was the sole judge of whether it would participate in a proposed transaction.   The parties desired flexibility and were not bound to specific types of transactions or specific volumes of transactions.   The language of the two documents reflects that the list was not meant to

15

be a guarantee of any particular customer or piece of business to Lavra or to limit the parties' business to those customers identified or a particular type of transaction.

Thus, Guarda's admission to calling on only two of the more than fifteen customers of Comerica listed on the Transaction Attachment, with regard to implementing foreign exchange transactions under the Strategic Alliance, in and of itself, does not raise a genuine issue of material fact as to her good faith.  Guarda in fact secured two of the identified customers, Pollone and Tupy.  Def.'s Ex. 43, Guarda Dep. at 279-80; Def.'s Ex. 12, Figueiredo Dep. at 418-20.  The record, read in its entirety, shows that Guarda worked vigorously to effect the SA.  She testified that Lavra needed customers and banking relationships so she introduced Comerica's correspondents to Lavra.  Def.'s Ex. 43, Guarda Dep. at 130.  She introduced and developed these prospects one at a time, given the tremendous effort involved in prospecting these clients.  Id.  Not only is her testimony undisputed, the  testimony of officers of Lavra reflect that Guarda had done nothing to hurt Lavra;  see Def.'s Ex. 31, Ceravolo Dep. at 142, and that she called on customers in conjunction with Lavra's employees.  Def.'s Ex. 12, Figueiredo Dep. at 108-09.  The record likewise shows that Guarda sought business from clients not listed in the Transaction Attachment, and that some of these deals were lost to competitors, see Def.'s Ex. 43 at 121, 137, Def.'s Ex. 7, A. Papa, Jr. Dep at 746-47, and that Lavra declined transactions proposed by Comerica because it did not have sufficient funds to handle them.  Def's. Ex. 12, Figueiredo Dep. at 426-27. Additionally, there is no evidence in the record showing that Comerica ever had an opportunity to direct additional business to Lavra and chose not to do so.  The Transactions Attachment indicates that a precondition to closing such business is "customer consent."

16

In addition, the Court finds that no genuine issue of material fact as to Comerica's good faith is created by Guarda's admission that she "made no effort on behalf of Comerica around February or March 1999." Pl.'s Ex. H at 139-40. Her testimony reflects sound business judgment as the basis for her conduct, not bad faith.

> We [were] very cautions after–when Banco Lara, Valdner Papa approached us that they were hit by the devaluation and that they had issues with the Central bank and that they were in trouble, this was February, March of 1999, we had to abstain from trying to go to these companies and sell the bank. We couldn't do that because we can't sell them a bank that's not doing okay. So, at that point in time, we had to, you know, kind of put this on hold I couldn't sell–I mean I can't go to somebody and saying, hey, this is a healthy institution, come and do business with them. I couldn't do that because I would be misrepresenting something.

Id. It is undisputed that Guarda's decision to refrain from creating business pursuant to the SA was built upon her knowledge of Lavra's precarious financial health. Hence, her conduct does not rise to bad faith as a matter of law. In the short time that the SA was in effect, the parties performed transactions worth approximately $20 million. Although the total is well below $400 million, the volume of transactions represented in the Transaction Attachment, see Pl.'s Ex. J, Valdner Papa Dep. at 678-79, there is insufficient evidence to show that the volume achieved was the result of bad faith performance on the part of Comerica.

### b. Good faith relative to financing

Lavra's claim that Comerica did not act in good faith relative to financing is build on its contention that Comerica knew that Lavra was small and financially unable to service any of Comerica's customers listed in the Transaction Attachment. Pl.'s Ex. H. Guarda Dep. at 68. Comerica extended only a $2 million credit facility to Lavra. Pl.'s Ex. T,

17

Figueiredo Dep. at 418-23.  Comerica never increased this amount, which, according to Lavra, demonstrates that Comerica never intended to abide by the terms of the SA.

Lavra's argument ignores its own limitations, its precarious financial position, and the explicit language of the Transactions Agreement, all considerations that colored Comerica's performance under the parties' agreement.  Marcio Papa explained that Lavra did not meet BACEN capital requirements to execute many, if not most, of the transactions listed in the Transactions Attachment, and Lavra did not have the money to perform others. Def.'s Ex. 8 at 601-02.  See e.g.  Bissell v. L.W. Edison Co., 9 Mich.App. 276,  283, 156 N.W.2d 623 (1968) (noting that liability under the contract extinguished if promise becomes objectively impossible).  There is no dispute that the amount of the loan facility was known to Lavra–the Transactions Attachment specifies that the "Discretionary Facility [was] (currently $2mm)."  The Transactions Attachment did not include any explicit language promising an increase in that provision or in the provision entitled "Further Capitalization Strategy of Banco Lavra (some ideas)."  Def.'s Ex. 24.  Moreover, when Lavra wrote to Comerica asking Comerica "to consider making a loan to further capitalize the bank," it added, "THIS IS NOT A REQUIREMENT OF PARTNERSHIP."  Def.'s Ex. 25 (emphasis in original).  In short, Lavra garnered insufficient evidence to support its claim that the SA was breached because additional credit was not provided to it to accomplish the transactions listed in the Transactions Attachment.

Finally, if the SA required Comerica to lend money to Lavra, such an agreement would have to be in writing and signed by the financial institution.  The Michigan Statute of Frauds in relevant part provides:

18

> An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:
>
>     (a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.

Mich. Comp. Laws § 566.132(2) (2002). The SA contains no provision requiring Comerica to lend money to Lavra.  Because the Michigan Statute of Frauds explicitly bars the enforcement of oral or implied promises to extend money or credit, Lavra's claim is unenforceable, and there can be no duty of good faith to breach.  See Shering-Plough Healthcare Prod., Inc. v. NBD Bank, N.A., 98 F.3d 904 (6th Cir. 1996).

In sum, neither the SA nor the Transactions Attachment contained a time limitation on performance.  Neither required that a particular amount of business be conducted.  See Def.'s Ex. 24.  Neither required that the line of credit to Lavra be increased.  Consequently, the Court finds Lavra's arguments fail to raise a genuine issue of material fact as to whether Comerica performed in good faith until the eve of Lavra's liquidation.  Comerica is entitled to summary judgment on Lavra's breach of contract claim.

## B.  BREACH OF FIDUCIARY DUTY

Before turning to the issue of whether Comerica breached a fiduciary duty owed to Lavra, the Court must ascertain whether the parties were in a fiduciary relationship.  A fiduciary relationship arises from a legally recognized "reposing of faith, confidence, and trust and the placing of reliance by one upon the judgment and advice of another."  Farm Credit Servs., P.C.A. v. Weldon, 232 Mich. App. 662, 680, 591 N.W.2d 438 (1999).  When a fiduciary relationship exists, the fiduciary has a duty to act for the benefit of the principal regarding those matters that are within the scope of the relationship.  Teadt v. St. John's

19

Evangelical Lutheran Church, 237 Mich.App. 567, 581, 603 N.W.2d 816 (2000).

Comerica maintains that its relationship with Lavra was that of debtor/creditor, landlord/tenant, or buyer/seller, whereas Lavra asserts that the parties were partners. Because a fiduciary duty arises in the context of a partnership, but not the other relationships identified by Comerica, the nature of the relationship is critical to the viability of Plaintiff's claim.   Accordingly, the Court directs its attention to the issue of whether Comerica and Lavra established a partnership.

### 1.  Did partnership exist?

A partnership is defined as "an association of 2 or more persons. . .to carry on as co-owners a business for profit."  Mich.Comp.Laws § 449.6 (2002).  If parties associate themselves in such a way as to carry on a business for profit they will be deemed to have formed a partnership, regardless of their subjective intentions. Byker v. Mannes, 465 Mich. 637, 645-646, 641 N.W.2d 210 (2002).  In light of the fact that the parties' intent is not dispositive, the name they give to their relationship likewise is not dispositive. Id. at 649. The nature of the relationship is determined by an objective standard. Id. Hence, the acts, declarations and conduct of the parties control. Id.

The burden of proof is on the party seeking to establish the existence of a partnership, Brown v. Frankenmuth Mut. Ins. Co., 187 Mich.App 375, 381, 468 N.W.2d 243 (1991), and the existence of a partnership is a question of fact. LeZontier v. Shock, 78 Mich.App. 324, 333, 260 N.W.2d 85 (1977).  Accordingly, in assessing the merits of the cross-motions for summary judgment, the Court is mindful that Lavra bears the burden of showing the parties formed a partnership.

The indicia upon which the parties rely to support their respective positions include

20

not only the parties' acts, declarations and conduct, but also evidence regarding profit sharing and joint control. <u>See</u> <u>Miller v. City Bank & Trust Co., N.A.</u>, 82 Mich.App. 120, 266 N.W.2d 687, 690 (1978) (noting that co-ownership is typically evidenced by joint control and the sharing of profits and losses); <u>Faulkner v. Faulknew</u>, 24 Mich.App. 633, 180 N.W.2d 491, 496 (1970) (observing that a party's receipt of profits from a business is prima facie evidence that the party is a partner in the business). The Court examines each below.

### a. Acts, conduct and declarations

As to the first indicia, Lavra notes that after the parties executed the Strategic Alliance, Guarda wrote to Valdner Papa for input on a upcoming visit of Comerica executives to Brazil and closed by affirming that the meeting would be one "of partners." Pl.'s Ex. O. The term "partners" was used on other occasions. For example, organizational charts attached as Exh. L. list Guarda as a representative of Comerica Bank, and identify Comerica as "Lavra's partner." <u>See</u> <u>also</u> Pl.'s Ex. V; Ex H at 180, 183-85. A web site document lists Guarda under the heading "International Banking' under the name Banco Lavra. Pl.'s Ex. W.

To rebut any written and oral assurances that the two were partners, Comerica relies on a distinction made by the Portugese speakers, who use the word "parceria," to describe the parties' relationship. Parceria translates to partnership in English, but denotes an informal partnership or a "profound friendship." <u>See</u> Def.'s Ex. 8, Marcio Papa Dep. at 172. Marcio Papa, testifying in his capacity as Lavra's Rule 30(b)(6) designee, admitted that Comerica and Lavra did not intend to be partners, but that the relationship was that of buyer and seller. <u>Id.</u> at 588. In sum, the parties entered into a relationship enjoyed by good customers, business associates, correspondent banks. Except for Valdner Papa, the

21

officers, shareholder and employees of Lavra all used the term parceria to describe the relationship between Lavra and Comerica. See e.g. Def.'s Ex. 31, Armando Ceravolo Dep. at 212-13; Def.'s Ex. 7, A. Papa, Jr. Dep. at 965-66, 983-84; Def.'s Ex. 42, Valdner Papa Dep at 509; Def. Ex. 2, Letter to BACEN. In contrast, the Portugese term for legal partnership is "sociedade." Only Valdner Papa used this designation to describe the parties' relationship.

Here, Lavra's reliance on Valdner Papa's testimony that the parties were partners, when all other members of the Papas family, as well as top officials of the bank, characterized the relationship as "parceria" is misplaced. Under the governing caselaw, a layman's use of the term partner does not create a partnership. Nor does Valdner Papa's subjective belief that the parties were partners create a genuine issue of material fact in that regard.

Additional and convincing support that a partnership was never formed is found in Comerica's conduct relative to the Strategic Alliance. It is undisputed that Comerica deleted all references to a relationship of partners in the Strategic Alliance, which was originally drafted as a "Partnership Agreement." See Pl.'s Ex. Z.

### b. Joint Control

Next, the parties contest whether the evidence shows that Comerica exercised joint control and management of Lavra. Lavra argues that the evidence does reflect joint control. Specifically, Guarda's set up an office in the Lavra building during the early part of 1999. See Pl.'s Ex. A at 406. She presided over all of Lavra's executive meetings. See Ex. J, Dep. of Marcio Papa at 213. She participated in the daily decisionmaking. Id. Lavra maintains that further evidence of joint control is reflected by Lavra's response to

22

Guarda, Heid and Ransdell's instruction to Lavra to change it method of operation and reduce staff because Comerica like to operate lean. Indeed, Lavra cut its staff in all departments, except international, because Comerica was only interested in the international department. See Pl.'s Ex. A at 257-58. Finally, Lavra points to Guarda's preparation of an organizational chart for the proposed acquisition, including the names of employees that Comerica considered "keepers" as well as their current salaries as further indicia of its control. See Pl.'s Exs. N and V.

Preparation for joint control cannot be equated with joint control. Lavra admits that Guarda made suggestions for management to rethink or consider. Def.'s Ex 50, M. Papa Dep. at 418-19. Ceravalo, a director of Lavra, testified that Guarda gave instructions to call on customers and stop selling small certificates of deposit; advice he ignored. Id. at 177-78. Certainly, no inference of joint control is created by the fact that Comerica leased space in the same building. Further the testimony that Guarda attended meetings, cannot be equated with control over the attendees. Guarda was reprimanded for "getting to close" to Lavra. Her conduct supports that characterization. Her attendance at meetings with Lavra's employees, provides a basis for that criticism. Despite her appearance at meetings, the testimony from the shareholders of Lavra is consistent–the executive directors were running the bank. See e.g. Def.'s Ex. 42, V. Papa Dep. at 508-09. There is no evidence that Guarda made credit decisions or participated in management discussion of specific strategic issues. Def.'s Ex. 8, Marcio Papa at 482. No one from Comerica was named an officer or director of Lavra, nor did anyone apply to BACEN for such permission. Id. at 489. These facts are consistent with the language of the SA which provides that each party to the agreement retained decision making authority over its

23

operations.

Again, the Court finds that to the extent factual disputes exist, they are not material. The evidence relied upon by Lavra creates no inference of joint control. The evidence reflects that Comerica sought a target for acquisition, and Lavra attempted to reinvent itself into a desirable target.

### c.  Profit sharing

It is undisputed that, pursuant to the SA, Comerica performed a series of transactions with Lavra generating revenues in excess of $100,000 which Comerica shared equally with Lavra.  See Pl.'s Ex. B.  This standing alone does not create even an inference that a partnership relationship exited.  The Strategic Alliance contains no commitment of capital or sharing of profits and losses.  Only revenue was shared.

Profit is defined as "excess of revenues over expense for a transaction.  Gain realized from business or investment over and above expenditures."  See Blacks Law Dictionary 1090 (5th ed. 1979).  The agreement struck by the parties does not satisfy the definition.  In this case, profits were not shared; each party was responsible for its own expenditures.

Moreover, many of the indicia one would expect to find in a partnership relationship are missing. Comerica did not pay Lavra's expenses; see Def.'s Ex. 8, Marcio Papa Dep. at 488, and it was not authorized to execute documents on behalf of Lavra or represent it before BACEN.  Notably there is no evidence of commingling of funds or property, no firm name, no certificate of partnership filed, no agreement on any of the factors to be expected if a partnership existed.

In sum, not one factor creates an inference that the parties created a partnership.

Moreover, the evidence--even considered cumulatively--fails, as a matter of law, to support the existence of a partnership. The parties were experienced business entities operating in a commercial setting, and, although they cultivated a good working relationship, that relationship did not rise to the level of a partnership. In light of this finding, the arguments raised by the parties relative to the issue of whether Comerica breached its duty to Lavra are moot.

## C. FRAUD

In its motion for summary judgment, Lavra advances two instances of fraud by Comerica. First, it argues that Comerica defrauded it by entering into the Strategic Alliance when Comerica never intended to abide by the terms of the agreement. Second, Lavra contends that Comerica defrauded it by agreeing to purchase Lavra when it had no intention to do so. In response, Comerica maintains that Lavra did not plea a fraud claim based on the Strategic Alliance. Additionally, Comerica asserts that it is entitled to summary judgment on Lavra's claim that Comerica defrauded Lavra through an unconditional offer to purchase the Brazilian bank.

To plead a fraud claim under Michigan law, a plaintiff must allege that: (1) the defendant made a material representation; (2) the representation was false; (3) at the time the representation was made, it was either known to be false, or made recklessly without any knowledge of its truth; (4) the representation was made with the intention that it should be acted on by plaintiff; (5) plaintiff, in fact, acted in reliance on it; and (6) plaintiff suffered damages as a result. See H.J. Tucker & Assoc., Inc. v. Allied Chucker & Eng'g Co., 234 Mich.App. 550, 595 N.W.2d 176, 187 (1999) (citing Hi-Way Motor Co. v. Int'l Harvester Co., 398 Mich. 330, 247 N.W.2d 813 (1976)). Fraud must be established by clear and

25

convincing evidence.  Foodland Distrib. v. Al-Naimi, 220 Mich.App 453, 457, 559 N.W.2d 379 (1996).

Although fraudulent misrepresentation typically must be predicated on a statement relating to a past or existing fact, an exception exists when a fraudulent misrepresentation is based on a promise made in bad faith without intention of performance.  Hi-Way Motor, 398 Mich. at 337-38.  Lavra proceeds on a promissory fraud theory.

### 1. Strategic Alliance

According to Lavra, the Strategic Alliance was merely phase one of the acquisition plan formulated by the parties.  It claims that Comerica intended that Lavra rely on the promises made in the Strategic Alliance as a means of increasing revenue to Comerica. Nevertheless, when the representatives of Comerica signed the Strategic Alliance, they had no intention of performing.  Lavra mischaracterizes the evidence.

Both Heid and Ransdell testified that they did not believe the Strategic Alliance was a binding agreement.  Based on their characterization of the SA, Lavra concludes that Comerica did not view the SA as the partnership it represented it to be and had no intention of moving its business to Lavra.  The inference does not flow from the facts.  First, the Court already has found that no partnership was formed.  Second, the Court observes that their belief as to the nature of the agreement is not dispositive; the yardstick by which to measure the merits of the claim is Comerica's conduct relative to the SA.  In that regard, the Court already has held that the evidence demonstrates that Comerica's representatives wanted the relationship with Lavra to succeed and that Guarda worked diligently in that regard.  Therefore, there is insufficient evidence to Support Lavra's claim that Comerica defrauded Lavra by entering into the Strategic Alliance but did not intend to abide by its

26

terms.

Lavra also relies on the personnel files of the Brazilian team as evidence in support of its contention.  The files show that Ransdell, Guarda and Heid were reprimanded for their conduct relative to Lavra.  Admittedly, Comerica was displeased with their conduct relative to the Strategic Alliance.  Buttigieg characterized Ransdell's execution of the document as a "significant error in judgment."  Pl.'s Ex. E, performance review.  The document was signed both without approval from the legal department and without the knowledge of Ransdell's supervisor.  Id.  These admissions do not constitute evidence that Comerica did not intend to use its best efforts relative to the Strategic Alliance.  To the contrary, Ransdell and Guarda were working diligently toward the acquisition of Lavra by Comerica.  In light of the Court's finding that the representatives of Comerica acted in good faith, Lavra's claim of fraud fails as a matter of law.

### 2.  Offer to purchase

Pursuant to the parties discussions, Comerica contemplated acquiring Lavra by 1999. Am. Compl. at ¶ 25.  At oral argument, counsel for Lavra represented that Comerica had made an unconditional offer to purchase Lavra and never informed Lavra that the decision was "dead."  Pl.'s Ex. BB, Def.'s Ex. 20, 21.  Def.'s Ex. 8, p. 495.  Instead, Comerica's representative advised Lavra that the decision was "postponed."  Id.

In reliance on the "agreement," Lavra asserts that it turned over all its books and records to Comerica, and Comerica undertook management of critical aspects of Lavra's operations, including Lavra's employment and personnel functions and corporate polices regarding depositors.  Lavra shed its retail operations and altered its staff and overhead structure as Comerica insisted.   Comerica did not send promised business, however, and

27

Lavra had to seek cash from Comerica in the form of a loan to avoid insolvency. Not until September 3, 1999, did Comerica inform Lavra that it would not be following through on a purchase.

Comerica argues that there is no evidence that it ever made an unconditional promise to purchase Lavra, nor could Lavra have reasonable relied on such a promise if made.

### a. Was a misrepresentation made?

Here, the Court finds that the record demonstrates, as a matter of law, that Comerica did not make a material misrepresentation, despite Lavra's insistence that Comerica promised to conclude an acquisition even after it determined it would not do so. The other Lavra officials admit that they were told Comerica never agreed to a purchase.

Here, Comerica has advanced unrefuted evidence that the Lavra officials knew that any potential sale required the approval of Comerica's senior management, and that senior management had postponed a decision on the purchase. See Def.'s Ex. 7, Dep. of Amedeo Papa, Jr. at 405 and 419; Marcio Papa Dep. Ex. 8 at 495. Amedeo Papa, Jr. also admitted that the only binding agreements between the parties were the Strategic Alliance and that Comerica's International Finance division would submit the request for approval to senior management. Def.'s Ex. 4, Dep. of A. Papa, Jr. at 419. This knowledge must be imputed to Lavra. Westinghouse Elec. & Mfg. Co. V. Hubert, 175 Mich. 568, 579, 141 N.W. 600 (1913) (holding that notice to an agent is notice to the principal).

Although Valdner Papa testified to the contrary at one point in his deposition, other testimony shows that he too was aware of this prerequisite. Def.'s Ex.6 at 601-02. He testified that following Lavra's third presentation to Comerica in July 1998, Guarda sent him

28

a letter requiring additional information on the bank's finances, employees, and operations. See Def.'s Ex. 18, letter, Def.'s Ex 6 at 599-600. Guarda wrote in the letter that the information was needed to present to the executive committee the recommendation of establishing a relationship with Lavra. Def.'s Ex. 18. According to Valdner Papa, two weeks later Guarda called and told him that Comerica's international division had approved a purchase, and "now it depended only on the meeting of the [senior management] committee of Comerica. Def.'s Ex. 42, Valdner Papa Dep. at 601-02, 405 , 500. Although Valdner Papa testified that Guarda told him that the purchase had been approved by Comerica's board, see Ex. 42 at 416, he clarified that testimony, adding that Guarda informed him that the purchase could not be "finalized" at that time because the international markets were unsettled, and admitted that Guarda characterized senior management's action as a "delayed decision." Id. at 417, 420. To the extent Guarda gave mixed messages, her conduct would not support a claim of fraud. Courts reject fraud claims were both true representations and alleged misrepresentations are made to a party on the same subject. Webb v. First of Michigan Corp., 195 Mich.App. 470, 474, 491 N.W.2d 851 (1997) (broker's representation that an investment was risk free not fraud where prospectus outlined the hazards available to investors).

Finally, the documents in the record show that Comerica did not reach a final decision about the purchase until August 1999. Lavra's only evidence to the contrary is the handwritten note made by Comerica chairman Eugene Miller in August or September 1998, which reads, "purchase of a bank is dead for the time being." Def.'s Ex. 21. Lavra's argument excludes the modifier "for the time being," and uses the note as conclusive proof the deal to purchase was "dead" as of September 1998. This reading ignores not only the

29

plain language of the note and the subsequent conduct of Guarda, Heid and Ransdell to effectuate an acquisition, but also the uncontroverted testimony of Miller. He testified that Comerica had not closed all doors to the purchase of Lavra. Def.'s Ex. 22, Miller Dep. at 90. In sum, the note does not establish that Comerica had decided never to proceed. Comerica continued to review Lavra's information and evaluate it as a potential acquisition. Because everyone at Lavra, with the exception of Valdner Papa, understood that the sale had not been approved by the upper management of Comerica, Lavra cannot establish a misrepresentation was made.

### b.  Was reliance reasonable?

Moreover, even if Comerica had made an unconditional oral representation to purchase, reliance on the representation by Lavra is unreasonable as a matter of law. In this case Lavra could not have reasonably relied on such a promise–Comerica had not provided a letter of intent, conducted due diligence, or drafted a purchase agreement. Regulatory approval had not been sought, nor had a closing date been set. Lavra had previously purchased a bank; and it was familiar with the procedure. Specifically, in 1996, Lavra purchased the assets of another Brazilian bank. Def.'s Ex. 6, V. Papa Dep. at 349-50. The purchase was consummated after negotiations followed by a letter of intent, a period of due diligence, identification of the assets to be acquired and a purchase agreement. Id. at 153. Accord Def.'s Ex. 7, A. Papa, Jr. Dep. at 740; Def.'s Ex. 8, M. Papa Dep. at 79.

The Court finds the reasoning of Continental Fin. Servs. Co. v. First Nat'l Bank of Boston, 1984 U.S. Dist. LEXIS 23978 (D. Mass. 1984), persuasive. In rejecting an oral promise to purchase in the context of a bank acquisition, it observed:  "[R]eliance on a

statement of future intent prior to the conclusion of negotiations in a complex business transaction is unreasonable as a matter of law. Such a rule is particularly appropriate when two sophisticated business entities are involved in negotiations: Until the documents are signed and delivered the game is not over." Id.

Lavra's attempt to distinguish that reasoning on the ground that the parties here were partners must be rejected in light of the Court's finding that no such relationship existed. Moreover, the facts are analogous. In Continental Fin. Servs., the defendant bank considered buying the plaintiff's subsidiary. After preliminary discussions, the defendant indicated it was "most interested" in pursuing a purchase. Id. at 2-3. Discussions continued for several months, and the defendant conveyed its interest to the plaintiff. The plaintiff in that case believed that a sale was imminent and sent a letter summarizing the terms that had been discussed, including a closing date and a formula for determining price. Id. at 5. When the defendant failed to take action, the plaintiff contacted the defendant about the delay. The defendant assured the plaintiff that no change had occurred. Id. The following month, a member of the senior management of the defendant bank reviewed the proposal, found the acquisition to be ill-advised, and notified the plaintiff. In rejecting the plaintiff's fraud claim, the court honed in on the element of reliance. It observed that even if the defendant had promised to buy the subsidiary, "Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements. . . . It is unreasonable to rely on statements of future intent made during negotiations because such statements are obviously contingent upon the parties reaching a final agreement." Id. at 9-10. Here, the negotiations did not even reach the same stage as in Continental Fin. Servs.

31

Finally, the Court observes that the conduct of the parties reveals that the Papas did not rely on a promise to purchase. The record shows that in February 1999, Valdner Papa talked to another Brazilian bank about a merger with Lavra. Def.'s Ex. 3 at 563-64; Ex. 6 at 591-92. See also Ex. 34, Letter from Marcio confirming that no agreement to purchase had even been reached). Moreover, Valdner Papa wrote in May 15, 1999 correspondence with BACEN that negotiations with Comerica were "ripe." He understood that a request for acquisition would be presented at the end of July 1999. Lavra's correspondence with BACEN and Valdner Papa's willingness to contemplate merging with a bank other than Comerica put to rest any notion that Lavra relied on a promise by Comerica to purchase the bank.

Accordingly, Lavra cannot establish reasonable reliance as a matter of law and Comerica is entitled to summary judgment on this claim. In sum, Lavra has failed to meet its burden to establish clear and convincing evidence of fraud.

### D.   COMERICA'S COUNTERCLAIM AND/OR AFFIRMATIVE DEFENSE OF FRAUD

Lavra moves for summary judgment on Comerica's counterclaim of fraud. The gist of Comerica's counterclaim is that Lavra's portfolio was fiction, and that, as early as 1998, Lavra had little real value. Lavra nevertheless represented to Comerica that it was a viable acquisition target.

As noted above, to plead a fraud claim under Michigan law, a counterplaintiff must allege that: (1) the counterdefendant made a material representation; (2) the representation was false; (3) at the time the representation was made, it was either known to be false, or made recklessly without any knowledge of its truth; (4) the representation was made with

32

the intention that it should be acted on by counterplaintiff; (5) counterplaintiff, in fact, acted in reliance on it; and (6) counterplaintiff suffered damages as a result. See H.J. Tucker & Assoc., Inc. v. Allied Chucker & Eng'g Co., 234 Mich.App. 550, 595 N.W.2d 176, 187 (1999) (citing Hi-Way Motor Co. v. Int'l Harvester Co., 398 Mich. 330, 247 N.W.2d 813 (1976)).

In support of its request for summary judgment, Lavra argues that it made no misrepresentation regarding its financial health. As proof of its position, Lavra relies on Guarda's memo to Ralph Heid, which references Lavra's precarious financial condition. Pl.'s Ex. H. Guara also testified that she did not believe she was misled by Lavra and that Lavra kept her apprised of its financial woes on a routine basis. Pl.'s Ex. C, Guarda Dep. at 146-47. The Court has reviewed Guarda's testimony and observes that it is of minimal value because she was testifying about her perceptions at the time the events occurred. Information post-liquidation has demonstrated to the contrary, thereby creating a question of fact as to whether Lavra concealed the extent of its deteriorating financial condition.

Lavra addresses only the first element Comerica needs to establish to succeed on its fraud counterclaim as a basis for its summary judgment request. The evidence does not establish Lavra met its burden of proof to show that, as a matter of law, it made no misrepresentation. Accordingly, its request for summary judgment is denied.

## V. CONCLUSION

For the reasons discussed above, the Court GRANTS Comerica summary judgment on the breach of contact, breach of fiduciary duty and fraud claims and DENIES the motion

as to Count C (quantum meruit) of the Amended Complaint.  The Court DENIES Plaintiff's

motion for summary judgment in its entirety and DENIES its request for reconsideration.

The Court DISMISSES Count D of the Amended Complaint.

      IT IS SO ORDERED.


                  s/Marianne O. Battani         
                   MARIANNE O. BATTANI
                   UNITED STATES DISTRICT JUDGE

Dated: October 5, 2005


## CERTIFICATE OF SERVICE

      Copies of this Order were served upon  J. Mark Brewer and Thomas J. Tallerico on
this date by ordinary mail and/or electronic filing.

                   s/Bernadette M. Thebolt
                   Deputy Clerk