**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

COMERICA BANK,

        Plaintiff,

v.

VALDNER PAPA and AMEDEO PAPA, JR.,

        Defendants.
_____/

CASE NO. 03-74894

HON. MARIANNE O. BATTANI

BANCO LAVRA,

        Plaintiff,

v.

COMERICA BANK,

        Defendant.
_____/

CASE NO. 03-60200

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING DEFENDANT'S
RENEWED MOTION FOR SUMMARY JUDGMENT**

Before the Court are Defendant Comerica Bank's Renewed Motion for Summary Judgment on Count C of Plaintiff's Amended Complaint (Doc. #197) and Defendant' Motion to Strike Exhibits to Banco Lavra's Opposition to Renewed Motion for Summary Judgment (Doc. #202). On March 22, 2006, the Court heard oral argument. At the conclusion of the hearing, the Court took the motions under advisement. For the reasons that follow, the Court **GRANTS** Defendant's Renewed Motion for Summary Judgment and **GRANTS in part and DENIES in part** Defendant's motion to strike.

I.     **PROCEDURAL BACKGROUND AND STATEMENT OF FACTS**

Banco Lavra ("Lavra"), a Brazilian bank and financial services institution which is no longer in business, filed this action after Defendant Comerica Bank ("Comerica") failed to purchase it. The facts as articulated below were set forth in the Court's October 5, 2005, Opinion and Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, wherein the Court awarded summary judgment to Comerica on Plaintiff's breach of contract claim, breach of fiduciary duty claim, and fraud claim.[1]

> In 1998, Comerica's International Finance Division, directed by Douglas Ransdell, and Ralph Heid, head of the Latin America Group, decided to explore opportunities in Brazil. They asked Z. Susan Guarda Garrity ("Guarda"), a vice president responsible for Comerica's lending customers having loans or operations in Brazil, to mine her contacts. At that time, Comerica did not have its own office in Brazil, and its transactions were limited to exchanges processed through a variety of correspondent banking relations.
>
> Guarda knew David Figueiredo, the head of the International Department at Lavra, and she told him that Comerica was entertaining the idea of launching a Brazilian platform. Def.'s Ex. 11, Guarda Dep. at 111-12. Figueiredo took this information to Amedeu Papa, Sr., who was president of Banco Lavra. The bank was part of a conglomerate of companies controlled by the Papa family. See Def.'s Ex. 3. In 1998, four brothers, Amedeu, Sr., Valdner, Marcio and Jose, Jr. owned 11.63% of the stock of the

---

[1] The Court declined to dismiss Count C, Lavra's claim of *quantum meruit*, noting, "Although Comerica advances an argument in its motion that Count C lacks factual support, see Brief in Support of Motion for Summary Judgment at 37, the Court finds that Comerica's single paragraph addressing the claim does not comport with its duty under the summary judgment standard. Moreover, Comerica's reliance on Lavra's failure to respond to the argument is misplaced; it is not the Court's obligation to read referenced exhibits and discern how they support Comerica's position." October 5, 2005 Order, p. 9 n.1.

principal holding company. Their parents owned 53%. Amedeu Papa, Sr. managed the bank until his death in June 1999. His son Amedeo Papa, Jr. took over management at that time. Def.'s Ex. 5, Sergio Tamouki Dep. at 297.

In March 1998, Guarda and some of the shareholders of Lavra, including Amedeu Papa, Sr., Marcio Papa and Valdner Papa, engaged in preliminary discussions about Comerica's possible acquisition of Lavra. Amedeu Papa, Sr. indicated he would be interested in selling a "minor part of Lavra," but that more discussions would have to take place. Def.'s Ex. 11, Guarda Dep. at 115-16.

On April 17, 1998, Ransdell, Heid, and Guarda from Comerica, and Amedeu Papa, Sr., Valdner Papa, and Amedeo Papa, Jr. met in Miami. Comerica made a presentation concerning the costs and benefits of a proposed acquisition. Am. Compl. at ¶ 15.

During the same time period, Comerica representatives had also instituted communications with members of the Brazilian Central Bank ("BACEN") in Brasilia. Am. Compl. at ¶ 17. The discussions included efforts by Comerica to negotiate the "toll" payable for obtaining a license to start a new bank. Because the toll for a new bank at that time was $10,000,000 for the license alone, Lavra was an attractive acquisition target.

After the April meeting, further discussions of the terms of an acquisition took place. In May, the same people met in Sao Paulo, Brazil to "brainstorm." Def.'s Ex. 7, Amedeo Papa, Jr. Dep. at 249. Amedeo Papa, Jr. characterized discussions as "very, very preliminary." Id. Valdner Papa suggested an arrangement with four phases. Def.'s Ex. 9, meeting agenda. The phases went from provision of a credit line to minority ownership, to majority ownership, to consideration of the sale of the entire bank. See id. The proposal afforded flexibility to Comerica: it could do as much or as little as it wanted. Def.'s Ex. 8, Marcio Papa Dep. at 505-06.

According to Valdner Papa, at the meeting an oral agreement was reached for an acquisition price that was 65% of Lavra's value, which at that time, was $34.5 million. Def.'s Ex. 6, Valdner Papa Dep. at 407-09 (testifying that a price condition was established). Valdner Papa reached this conclusion when the proposal was made because Comerica's representative remained silent. Id. Lavra's shareholders agreed to stay at the bank for 3 to 5 years after completion of the acquisition. Am. Compl. at ¶ 15. According to

3

Comerica, after the meeting Ransdell said he would "start talking about" presenting Lavra as a possible acquisition candidate. Def.'s Brief in Support of Motion for Summary Judgment at 5.

On July 6, 1998, representatives of the parties met again. Joe Buttigieg, Executive Vice President of Comerica, was in Brazil and attended the meeting. The parties dispute what happened after the meeting. According to Lavra, Guarda assured Lavra's shareholders that the acquisition was a "done deal" and "shook hands" on it. Am. Compl. at ¶ 18. Then Guarda requested, and Lavra provided, internal and confidential information. Id. at ¶ 19. In contrast, Comerica claims that Guarda only represented that the proposed acquisition had been accepted by the International team and that it would be presented to the executive committee. In her June 21, 1998 letter to Amedeo Papa, Guarda discusses the demanding and lengthy process in dealing with Comerica. Def.'s Ex. 16. She subsequently faxed a request to Valdner Papa, dated July 14, 1998, requesting "information [that] was needed to in order to present to [its] executive committee [its] recommendation of establishing a relationship with Banco Lavra." Def.'s Ex. 18, Guarda fax.

Thereafter, Ransdell presented a proposal to senior management for "approval to undertake due diligence regarding the purchase of a controlling interest in a small Brazilian commercial bank." Def.'s Ex. 21. At the September 16, 1998 meeting, the Chairman of Comerica, Eugene Miller, wrote "purchase of a bank is dead for the time being;" Am. Compl. at ¶ 21. Nevertheless, the committee did approve the establishment of a "representative office" in Brazil. Am. Compl. at ¶ 20.

Ransdell asserts that he informed the Papas of this decision. There is a dispute as to what information was conveyed. Guarda did inform Lavra that due to a "financial crisis in Asia, any acquisition would be delayed. Later, she told Lavra it would be delayed again due to the Russian "financial crisis. Am. Compl. at ¶ 20. Without question, the precise content of Miller's note was not revealed to the Papas, but they certainly were informed that a decision to purchase was not made.

Guarda subsequently suggested that the parties should exchange final documents so the acquisition could be finalized when the international financial markets settled down. AC at ¶ 22. Ransdell and Guarda told Amadeo Papa, Marcio Papa, and Valdner Papa, that Comerica would sign a Strategic Alliance to show their good will and good faith.

Comerica and Lavra entered into a Strategic Alliance Agreement ("SA") on October 13, 1998. The SA provides that its purpose is "to create optimum conditions for good customer service. . .to improve existing customer relations and participate in new opportunities of mutual benefit to both participants." Def.'s Ex. 23. Another relevant provision includes that the parties agree "at their [sic] sole discretion, to use each other's products and services when reasonably possible and consistent with their other business relationships in the conduct of business involving [clear] payments, commercial trade letters of credit, collections, closing of. . .exchange, foreign exchange and such other business opportunities that are of interest to both participants." Id. They agreed to "share 50/50 on revenues and fees earned on the Brazilian side of transactions on corporate relationships introduced by Comerica to Banco Lavra. . . ." Id. In addition, each party retained the right to decline to participate in a proposed transaction and could terminate the agreement with three months notice. Id.

After the SA was signed, Guarda presented a three-page document titled "Transactions to be Closed under Strategic Alliance between Banco Lavra and Comerica Bank" (Transactions Attachment). Def.'s Ex. 24. The Transactions Attachment lists existing Comerica customers, types of services provided, and the amount of Comerica's then-existing loan facility with each customer. See id. All signatories to the SA initialed the Transaction Attachment. Id. The relationship between the parties continued. In November 1998, Buttigieg, Heid and Guarda traveled to Brazil and made joint customer calls. Throughout the time period immediately following the signing of the SA, Guarda made numerous customer calls with Lavra officers.

In February 1999, Comerica leased space from Lavra, and Guarda used the space as headquarters for Comerica's representative office, Comerica do Brasil. Am. Compl. at ¶ 28. Throughout this timeframe, Comerica kept in regular contact with BACEN, discussing the toll charge if Comerica were to purchase a bank and trying to convince BACEN to waive it. Id. Yet, Guarda attended some BACEN meetings with representatives from Lavra. According to Amedeo Papa, Jr., Guarda represented to BACEN that Comerica had a firm intention to pursue an acquisition, but due to the volatility of the financial market, the board had not yet approved the purchase.

In May, 1999, Miller was in Brazil for the grand opening of the representative office. He indicated that Comerica was interested in

acquisition, but any purchase was subject to Board approval. Def.'s Ex. 7, A. Papa, Jr. Dep. at 243-44.

On April 28, 1999, BACEN ordered Lavra and its accounting firm to appear before BACEN's Inspection Department. Def.'s Ex 1. Adjustments to Lavra's balance sheet were demanded in February 1999, and Lavra was left with a negative net equity. Id. BACEN mandated an injection of capital or a plan to bring the bank within regulations for liquidity and reserves. Id. BACEN subsequently warned Lavra that failure to comply could result in legal penalties. Id. Lavra did not provide a copy of this document to Comerica, and the parties dispute the extent to which information regarding Lavra's financial health was disclosed to Comerica. Def.'s Ex. 7, A. Papa, Jr. Dep. at 710, 802 (admitting that he never mentioned the negative net worth).

Also, during this timeframe, Ransdell and Heid again prepared for a purchase presentation to senior management. Buttigieg asked Guarda to prepare a list of keepers–employees who Comerica should retain post-acquisition. Heid drafted a new formal presentation for senior management in July 1999, in which he recommended initiating due diligence with a "view to purchasing Lavra." Def.'s Ex. 32. At an August 9, 1999 meeting, Comerica's president, Eugene Miller, Buttigieg, and Ransdell outlined concerns that had been raised over the potential deal. Def.'s Ex. 33. At that time, Comerica also learned that the law regarding foreign ownership of banks in Brazil had changed, and it might be possible to obtain a license for a new bank without buying an existing bank. Def.'s Ex. 11, Guarda Dep. at 371-72. Senior management decided that both options--purchase of an existing bank or opening a new bank--should be explored. Ransdell and Guarda met with BACEN on August 13, and 16, 1999, to pursue the opening a new bank option. Mark Yonkman, an attorney for Comerica, also went to Brazil and met with BACEN governor Sergio D'Arcy on August 18, 1999, to explore the purchase of an existing bank. At the meeting, D'Arcy confirmed that purchase of Lavra stock and assets would expose Comerica to successor liability. Def.'s Ex. 15, Heid Dep. at 37-8.

On August 27, 1999, BACEN gave Lavra 15 days to present a definite proposal for sale of the bank to Comerica or another institution. On August 30, Marcio Papa sent a letter to Comerica requesting a "definite and formal statement" from Comerica

6

> regarding its interest. Def.'s Ex. 34. At a conference call held September 2, 1999, Comerica indicated that it would not purchase Lavra. Lavra entered voluntary liquidation on September 20, 1999. Def.'s Ex. 35.

In support of its *quantum meruit*, Lavra alleges in its Amended Complaint that "following the fall 1998 [Strategic Alliance] agreement, Comerica requested and Banco Lavra continued to provide Guarda all of Lavra's internal, confidential information and trade secrets, as well as the name of Lavra's customers, the means and methods of its banking business, sensitive financial information, and the like. Am.Compl. at ¶ 28. According to Lavra, it provided valuable services to Comerica, which allowed Comerica to set up its "platform" of operation in Brazil; Comerica accepted those services and knew or should have known that Banco Lavra, in performing these services, expected to be paid by Comerica. Id. at ¶ 44.

In addition to the dispositive motion, Defendant asks the Court to strike the exhibits to Banco Lavra's response brief. Comerica asserts that exhibits B, D, E, G, H, J, K and L have been submitted for an improper purpose and in violation of local practice. Lavra denies the allegations and seeks leave to correct its exhibits.

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

> In our view, the plain language of Rule 56(c) mandates the entry of

>summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002). "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002). "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256 (1986). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted) (quoting Black's Law

Dictionary 881 (6th ed. 1979)). To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50. "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The evidence itself need not be the sort admissible at trial. Tinsley v. General Motors Corp., 227 F.3d 700, 703 (6th Cir. 2000). However, the evidence must be more than the nonmovant's own pleadings and affidavits. Smith v. Campbell, 250 F.3d 1032, 1036 (6th Cir. 2001). The mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant. Anderson, 477 U.S. at 252.

### III. ANALYSIS

#### A. Exhibits

Before considering the merits of the dispositive motion, the Court addresses Comerica's request that the Court strike Plaintiff's exhibits B, D, E, G, H, J, K, and L. Comerica asserts that Lavra has included these exhibits not to assist the Court in rendering a decision on the pending motion, but to provide a basis for an appeal of the Court's award of summary judgment on the breach of contract, breach of fiduciary duty and fraud claims. Comerica points to Lavra's inclusion of entire transcripts rather than the pages upon which

it relies to support its response; conduct that violates the Court's stated practice guidelines[2] and also Lavra's prior custom.

In response, Lavra maintains that Comerica's motion is based on a fundamental misconception of the applicable rules concerning briefing. Lavra insists that the Court would be deprived of useful information if it did not review the included materials before ruling on Comerica's dispositive motion.

The practice of this Court limits depositions transcripts to those pages relevant as support for a party's statement of material facts. The Court has no obligation to sift through all the evidence gleaned in discovery, searching for those portions of a deposition that support a party's position. Therefore, the Court strikes those portions of the depositions that are not referenced in the brief. Exhibits B, D, E, G, J, and K fail to comply.[3] Those pages that Lavra includes in the exhibits but fails to cite are stricken. The Court does grant Lavra's request for leave to include pinpoint citations to the Mauch deposition.

Comerica challenges the Declaration of Luciane Brandao, attached as Exhibit H, on

---

[2]The practice guideline, posted on the Court's website, reads in relevant part, "Parties are required to support the statement of material facts with citations to pleadings, interrogatories, admissions, depositions, affidavits, or documentary exhibits. Submit only the relevant pages of depositions and underline the specific reference to documents where applicable."

[3]Exhibit B is the deposition transcript of Claudio Mauch, which Plaintiff uses to support its contention that Comerica took over Lavra. The deposition is 212 pages and includes an attachment, Ex. M-4, which is in Portugese. There is no specific citation to the deposition in Plaintiff's brief. Exhibits D and E are deposition transcripts of Susan Guarda; Plaintiff cites to eight pages of her deposition. Exhibit G is the Deposition of David Figueiredo; Plaintiff sites to only one page of the 183 page deposition. Exhibit J is the Deposition of Ralph Heid; only two of the 79 pages are cited. Exhibit K is the 123-page deposition transcript of Douglas Ransdell; Lavra cites to one page.

another ground. Comerica argues that it should not be considered because Brandao's name did not appear on Lavra's witness list. Lavra does not contest that fact; however, it informs the Court that it has given Comerica her name on numerous occasions, including its Rule 26(a)(1) disclosures. Accordingly, the Court declines to preclude the use of her declaration to defend against a motion for summary judgment. Further, the Court grants Lavra leave to include pinpoint citations to the Brandao declaration.

The final exhibit at issue, Exhibit L, is the Opinion Report of Plaintiff's expert, Rusty Williams. Lavra cites the report for the proposition that it conferred a benefit of $18,000,000 on Comerica. The report itself asserts that the damage calculations are based on the failed claims of "the non-performance of the . . .Strategic Alliance," breach of the "partnership relationship," and the failure to consummate or terminate the acquisition of Lavra. The Court already granted summary judgment to Comerica on these claims. Consequently, the Court agrees with Comerica that relevance limits the utility of the report. The damages must relate to the claim advanced–*quantum meruit*. To the extent that the report may be useful to the Court in that limited regard, the Court declines to strike it.

**B.  *Quantum meruit***

Comerica seeks summary judgment on Banco Lavra's sole remaining claim of *quantum meruit*. The parties dispute whether the exchanged services were the result of and fall within the scope of the Strategic Alliance as well as the sufficiency of Lavra's evidence.

"*Quantum meruit* is an equitable doctrine generally applied to prevent unjust enrichment." Idalski v. Crouse Cartage Co., 229 F.Supp.2d 730, 740 (E.D. Mich. 2002). The elements of a claim of unjust enrichment include receipt of a benefit by the defendant

from the plaintiff, retention of which is inequitable. In re McCallum Estate, 395 N.W.2d 258, 261, 153 Mich.App. 328, 335 (1986). In assessing a claim for *quantum meruit*, the court implies an intent to pay to prevent unjust enrichment. Roznawski v. Bozyk, 251 N.W.2d 606, 73 MIch.App. 495, 409 (1977).

The first matter the Court must resolve is the impact of the Strategic Alliance on the viability of Lavra's claim. The law is clear: where an express contract covers the subject matter in dispute, no claim for *quantum meriut* lies. Superior Ambulance Serv. v. City of Lincoln Park, 173 N.W.2d236, 239, 19 Mich.App. 655, 663 (1969). The mere existence of an express agreement between the parties does not end the analysis. If a party performs additional work or confers a benefit not contemplated by an express agreement, an action for unjust enrichment lies. In re Dunnigan's Estates, 276 N.W. 532, 533, 282 Mich. 500 (1937).

Lavra argues that the terms of the SA include nothing about Comerica entering Lavra's offices to do business, requiring Lavra's employees to introduce Lavra's customers to Comerica, accessing Lavra's confidential, proprietary information, making provisions to Lavra's balance sheet, occupying space in Lavra's building, or making visits with Comerica to Central Bank for the purpose of establishing Comerica's presence in Brazil. The Court examines each to determine whether it falls outside the scope of the SA and if so, whether it constituted a benefit to Comerica, the retention of which is inequitable.

### 1. Customer calls and introductions

The purpose of the SA was to "participate in new opportunities of mutual benefit to

both participants." Def.'s Ex. 2 The parties agreed to equally share specified revenues and fees resulting from these opportunities. Based on this language, the Court finds that the SA contemplates the introduction and sharing of clients by the parties in order to close business deals. That is not the only reason the *quantum meruit* claim fails.

Even if Lavra spent significant time and effort to introduce Comerica to its business contacts, it is undisputed that Comerica did indeed split the revenues of any business on the Brazilian side of transactions with Lavra. Consequently, there is no showing that Comerica was unjustly enriched as a result. Nor is the Court persuaded to the contrary by evidence that Armando Ceravolo, a former director of Lavra involved in business development, threw a lavish party to celebrate the opening of Comerica's representative office. See Ex. F., Ceravolo Decl. Ceravolo was not a party planner expecting payment for his services; he testified that Lavra's "professional dealings" with Guarda were related to Comerica's plan to purchase Lavra. Id. at ¶ 6. He also indicated his efforts were to benefit Lavra. In sum, there is no basis upon which a reasonable person could find that Comerica was unjustly enriched by the introduction of clients and sharing of business opportunities.

### 2. Confidential information and balance sheet adjustments

According to Lavra, it turned over all its books and records to Comerica, and Comerica undertook management of critical aspects of Lavra's operations, including Lavra's employment and personnel functions and corporate polices regarding depositors. Lavra shed its retail operations and altered its staff and overhead structure as Comerica insisted. Comerica requested and received unfettered access to Lavra's confidential

proprietary information. Lavra made provisions to its balance sheet[4] at Comerica's request and "essentially turned over Lavra to Comerica." Pl.'s Brief at 8. The Court agrees with Lavra that this conduct was not contemplated by the SA. Nevertheless, the conduct does not support a finding that Comerica was unjustly enriched.

In looking at the "benefits" Lavra gave to Comerica, the Court finds that Lavra advanced these "benefits" as part and parcel of making it a desirable target of acquisition, not with the expectation of payment. Further, Lavra has yet to explicitly identify what benefit Comerica retained. If anything, Comerica's access to the confidential information put an end to any acquisition plans it contemplated. There is no evidence that Comerica used this information to compete against Lavra in the Brazilian market. Likewise, the adjustment to the balance sheet did not confer a benefit upon Comerica.

### 3. Lease

Comerica opened an office inside Lavra. Without question, the SA does not include any provision for the physical location of Comerica's office in Brazil, much less provide that Comerica occupy space therein. Although there is a written lease agreement signed by Lavra, it appears that Comerica did not sign that agreement. See Ex. D, Guarda Dep. at 13-14. See also Ex. C to Reply, a copy of the unsigned lease agreement. Consequently, for purposes of this motion, the Court assumes the *quantum meruit* claim is not precluded by a lease agreement.

---

[4]According to Lavra, Guarda insisted that Valdner Papa agree to charge back R$6,791,000 to its 1998 balance sheet. Guarda insisted this be done so that when Comerica acquired Lavra, the 1999 financial statements would begin with numbers that Comerica knew in detail and which had been discussed and approved by Central Bank. Id. See Ex. H Luciane Brandao Decl. Lavra only did this because Comerica requested it. Id.

The evidence shows that the parties operated as if a lease had been signed. Comerica spent a significant amount of money on renovations to the office space. Nevertheless, the record before this Court shows that Comerica leased the space and paid rent.  The deposition testimony of Joe Buttigieg, that Comerica paid rent on the representative office occupied by Guarda, is unrefuted.  Lavra has not challenged his testimony with competent evidence.

In sum, the evidence offered to show Comerica was unjustly enriched fails as a matter of law.  Lavra's claim, in essence, is that Comerica benefitted unjustly because it made it possible for Comerica to establish a platform for operation in Brazil.  Lavra insists that it conferred a benefit in the amount of $18 million, its net worth as of Sept. 20, 1998, immediately prior to Comerica's "take over."

It is the opinion of the Court that the facts demonstrate that Lavra is actually seeking a remedy for its expenditures on "pre-due diligence" and conduct taken to make it a desirable acquisition target.  Unjust enrichment is not an appropriate remedy for recovery of the expenses of a failed negotiation. Neither equity nor good conscience require another outcome.  "Every businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement." Gruen Industries, Inc. v. Biller, 608 F.2d 274, 282 (7th Cir. 1979).  Accord, Volumetrics Meical Imaging, Inc. v. ATL Ultrasound, Inc., 243 F.Supp.2d 386, 411-13 (N.D. N.C. 2003) (rejecting a claim for unjust enrichment because information given to the defendant "in the course of discussing a possible relationship" is not exchanged with the expectation of payment).  Here, Lavra seeks to recoup expenditures it willing made, not with the idea that Comerica would pay for them, but with the belief that

15

Comerica eventually would acquire the bank. Comerica was not unjustly enriched; Lavra is not entitled to restitution.

## V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Comerica summary judgment on Count C (quantum meruit) of the Amended Complaint and **GRANTS in part and DENIES in part** Comerica's motion to strike.

**IT IS SO ORDERED**.


       s/Marianne O. Battani
         MARIANNE O. BATTANI
         UNITED STATES DISTRICT JUDGE

Dated: May 31, 2006


### CERTIFICATE OF SERVICE

Copies of this Order were mailed to J. Mark Brewer and Thomas J. Tallerico on this date by ordinary mail and/or electronic filing.

       s/Bernadette M. Thebolt
         Deputy Clerk